**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ERIK LUCHSINGER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:06CV628 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,[1]** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Erik Luchsinger for Supplemental Security Income under Title XVI of the Social Security Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a Brief in Support of the Complaint. (Document Number 18). Defendant has filed a Brief in Support of the Answer. (Doc. No. 21).

## Procedural History

On August 25, 1999, plaintiff filed his application for Supplemental Security Income, claiming that he became unable to work due to his disabling condition on January 1, 1996. (Tr. 90-91). This claim was denied initially (Tr. 75-78), and following an administrative hearing,

_____

[1]This case was originally filed against Jo Anne B. Barnhart, who was at that time Commissioner of the Social Security Administration. On February 12, 2007, Michael J. Astrue became the Commissioner of the SSA, and he hereby is substituted as the defendant in this action. See Fed.R.Civ.P. 25(d)(1).

plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated March 6, 2001. (Tr. 12-24). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on September 27, 2002. (Tr. 8, 2-3). Plaintiff filed an action in this court for judicial review of the decision of the Commissioner denying benefits. The Commissioner filed a Motion to Reverse and Remand the case to an ALJ, in order for the ALJ to further evaluate plaintiff's functional limitations attributable to post-traumatic stress disorder and the use of an assistive device, and to adduce updated medical evidence. The undersigned granted the Commissioner's motion and remanded the matter to the Commissioner for further proceedings. (Tr. 271-72). On December 19, 2005, an ALJ rendered a second decision, again finding plaintiff was not disabled. (Tr. 255-68). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## **Evidence Before the ALJ**

### A. **ALJ Hearing**

Plaintiff's administrative hearing was held on March 31, 2005. (Tr. 622). Plaintiff was present and was represented by counsel. (Id.). Also present was vocational expert Michael Brethauer. (Id.). The ALJ began by admitting the exhibits into the record. (Tr. 624).

The ALJ then examined plaintiff, who testified that he lived in a trailer in Fenton, Missouri, with his wife. (Tr. 625). Plaintiff stated that he had a GED and additional schooling in welding. (Id.). Plaintiff testified that he was receiving Veteran's Administration (VA) benefits. (Id.). Plaintiff stated that he had just received a 70 percent disability rating from the VA. (Tr. 626). Plaintiff testified that he had been receiving a 30 percent disability rating due to his wife's

earnings but he appealed the decision and his rating was changed to 70 percent. (Id.). The ALJ asked plaintiff's attorney if he could verify this information. (Id.). Plaintiff's attorney stated that plaintiff was originally receiving 30 percent service-connected disability benefits and it was raised to 100 percent unemployable pension benefits. (Tr. 627). Plaintiff's attorney stated that due to plaintiff's wife's income, they lowered his benefits back down to the 30 percent service-connected benefits. (Id.). Plaintiff's attorney stated that plaintiff's benefits were increased to 100 percent after plaintiff's wife stopped working. (Id.). The ALJ asked plaintiff's attorney whether he could obtain from the VA plaintiff's service-connected disability rating as this could be helpful to plaintiff's pending application. (Tr. 629). Plaintiff's attorney indicated that he would try to obtain this information. (Id.).

Plaintiff testified that he had worked as a self-employed carpenter. (Id.). Plaintiff stated that he also had a night-shift cleaning position at Concord Bowling Lanes. (Tr. 630). Plaintiff testified that the heaviest amount he lifted at this position was eighteen pounds. (Id.). Plaintiff stated that he also worked as a hospice care giver. (Id.).

Plaintiff testified that he cared for his mother-in-law when she had cancer. (Id.). Plaintiff stated that at this position, he prepared meals, fed his mother-in-law, helped her in and out of bed, changed bedding, and cleaned. (Id.). Plaintiff testified that this was a full-time position for which he was paid. (Id.). Plaintiff stated that he did not bathe his mother-in-law, wash her clothes, or give her medication. (Tr. 631).

Plaintiff testified that he worked as a self-employed carpenter for two-and-a-half years. (Id.). Plaintiff stated that he stopped working as a carpenter because he was injured while working when a piece of ceramic hit his artery. (Id.). Plaintiff testified that he does not

remember when this occurred. (Id.). Plaintiff stated that the heaviest item he lifted at this position was an 80 pound bag of concrete. (Tr. 632). Plaintiff testified that he supervised five people at this position. (Id.). Plaintiff stated that he also handled the financial aspects of the business. (Id.).

Plaintiff testified that he was a combat field medic when he was in the military. (Tr. 633). Plaintiff stated that he received ten weeks medical training in Houston, Texas for this position. (Id.).

Plaintiff testified that he has never applied for unemployment benefits or Workers' Compensation benefits. (Id.).

Plaintiff testified that he did not feel that he could work full-time at the time of the hearing. (Tr. 634). Plaintiff stated that arthritis in his legs is his worst physical problem preventing him from working. (Id.). Plaintiff testified that his legs bother him in the morning when he wakes up. (Id.). Plaintiff stated that he takes medication for his pain. (Tr. 635). Plaintiff testified that he takes pain medication when he wakes up in the morning, which helps relieve the pain in his legs. (Id.). Plaintiff stated that the medication lasts until about 2:00 p.m., at which time he takes another dosage of medication. (Id.).

Plaintiff testified that he uses a cane that was given to him by the VA every day to control his balance. (Id.). Plaintiff stated that he has been using the cane for seven years. (Tr. 636). Plaintiff testified that he has a walker at home, but he seldom uses it because he loses his balance. (Id.). Plaintiff stated that his animals also get in his way when he uses the walker. (Id.). Plaintiff testified that he also has a three-wheel vehicle given to him by the VA, which he uses outside to go to the store. (Id.). Plaintiff stated that he uses assistive devices for balance. (Id.). Plaintiff

testified that he has problems with his sense of balance rather than a problem with his legs. (Id.). Plaintiff stated that only his medication helps decrease the pain in his legs. (Tr. 637).

Plaintiff testified that he also experiences back pain. (Id.). Plaintiff stated that his back pain results from too much heavy lifting. (Id.). Plaintiff testified that his back occasionally "locks up." (Id.). Plaintiff stated that his doctor advised him to stop lifting heavy items or he would have to undergo surgery. (Id.). Plaintiff testified that he no longer does any heavy lifting. (Id.). Plaintiff stated that he has been experiencing back problems since at least 1994. (Id.). Plaintiff testified that he will not have to undergo surgery because he no longer lifts heavy objects. (Id.). Plaintiff stated that he has back pain when he wakes up in the morning. (Tr. 638).

Plaintiff testified that the pain medication he takes in the morning eliminates his back pain. (Id.). Plaintiff stated that he has a shower massager that also helps decrease his back pain. (Id.). Plaintiff testified that if he moves a certain way while sleeping, his back hurts. (Id.). Plaintiff stated that he cannot take his medication during the night, so he usually stays up at night to avoid this problem. (Id.). Plaintiff testified that his back pain occurs in his lower back. (Id.). Plaintiff stated that his leg pain occurs at the top of his legs, going down toward his hips. (Tr. 639). Plaintiff testified that he also experiences pain in his hands, feet, back, and leg during cold weather. (Id.).

Plaintiff testified that his medication causes his mouth to become dry. (Id.). Plaintiff stated that his medication works very well. (Id.). Plaintiff testified that, after taking his medication, he sits and watches television and he is not in any pain. (Id.).

Plaintiff stated that he has problems with balance. (Id.). Plaintiff testified that his cane helps prevent him from falling, although he has tripped over himself. (Tr. 640). Plaintiff stated

that he usually trips about once a month.  (Id.).

Plaintiff testified that he often forgets things.  (Id.).  Plaintiff stated that he has suffered from memory problems for about four-and-a-half years.  (Id.).  Plaintiff testified that he will pour himself a drink and then walk into another room, forgetting the drink.  (Id.).  Plaintiff stated that he also forgets events that occurred in the past.  (Tr. 641).  Plaintiff testified that he sees a doctor at the VA hospital for this problem.  (Id.).  Plaintiff stated that his doctor has prescribed medication for him.  (Id.).  Plaintiff testified that he takes medication that causes him to sleep and prevents him from having bad dreams.  (Id.).

Plaintiff stated that his doctor has told him that his memory problems and bad dreams are both related to his experience in Vietnam.  (Id.).  Plaintiff testified that he has been diagnosed with posttraumatic stress disorder (PTSD).[2]  (Id.).  Plaintiff stated that his memory problems could be a symptom of PTSD.  (Tr. 642).  Plaintiff testified that he does not experience any side effects from the medication he takes at night for his PTSD.  (Id.).  Plaintiff stated that the medication helps him sleep.  (Id.).

Plaintiff testified that he has been having flashbacks since 1974.  (Id.).  Plaintiff stated that his flashbacks are not as severe as they used to be due to the medication he takes.  (Id.).  Plaintiff testified that he has flashbacks about once or twice a week.  (Id.).  Plaintiff stated that the flashbacks cause him to see things on his right side that are not there.  (Tr. 643).  Plaintiff testified that his flashback episodes are very frightening.  (Id.).  Plaintiff stated that he usually takes his

---

[2]Development of characteristic long-term symptoms following a psychologically traumatic event that is generally outside the range of usual human experience; symptoms include persistently re-experiencing the event and attempting to avoid stimuli reminiscent of the trauma, numbed responsiveness to environmental stimuli, a variety of autonomic and cognitive dysfunctions, and dysphoria.  See Stedman's Medical Dictionary, 570 (28th Ed. 2006).

medication and goes to bed after having a flashback. (Id.). Plaintiff testified that there is no known trigger for his flashbacks. (Id.).

Plaintiff stated that when he does not take his medication he becomes very "onery." (Id.). Plaintiff testified that he is fine when he takes his medication. (Tr. 644). Plaintiff stated that he experiences drowsiness in the afternoon when he takes his medication. (Id.). Plaintiff testified that he no longer takes naps because he has bad dreams when he falls asleep. (Id.).

Plaintiff stated that on a typical day, he takes medication at about 7:00 p.m. and goes to bed at about 10:00 p.m., after taking more medication. (Tr. 645). Plaintiff testified that he usually sleeps seven to seven-and-a-half hours a night. (Id.). Plaintiff stated that he does not sleep through the night. (Id.). Plaintiff testified that he usually wakes up during the night to go to the restroom. (Id.). Plaintiff stated that he wakes up at around 8:15 a.m. (Id.). Plaintiff testified that he showers and gets dressed every day. (Id.).

Plaintiff stated that he spends most of the day on the computer. (Tr. 646). Plaintiff testified that he looks up friends and plays games on the computer. (Id.). Plaintiff stated that he spends ten to twelve hours a day on the computer. (Id.). Plaintiff testified that he walks away from the computer for about two hours a day because the screen hurts his eyes. (Id.). Plaintiff stated that when he is not on the computer, he reads magazines and watches televison. (Tr. 647). Plaintiff testified that he prepares his own food. (Id.).

Plaintiff stated that his wife was not working at the time of the hearing. (Id.). Plaintiff testified that his wife is at home during the day and that he spends time with her. (Id.). Plaintiff stated that his wife talks about remodeling their home and spends time with her friends. (Id.).

Plaintiff testified that he performs household chores. (Id.). Plaintiff stated that he washes

dishes, cleans the cabinets, and takes care of his animals. (Tr. 648). Plaintiff testified that his wife bought him a lawnmower that he plans to hook up to his three-wheel scooter and cut the grass. (Id.). Plaintiff stated that he does his own laundry. (Id.).

Plaintiff testified that he has a driver's license and that he occasionally drives. (Id.). Plaintiff stated that he drives to the hospital. (Id.). Plaintiff testified that he uses his three-wheel scooter to get around. (Id.). Plaintiff stated that he can drive 25 miles on his scooter. (Tr. 649). Plaintiff testified that he usually drives down the street on his scooter to visit a friend. (Id.). Plaintiff stated that his wife drove him to the hearing. (Id.). Plaintiff testified that his psychiatrist told him that he should not drive while taking his medication. (Id.). Plaintiff stated that he does not take his medication when he drives to the hospital. (Id.).

Plaintiff testified that he used to drive his scooter to VFW meetings on the first Tuesday of every month. (Tr. 650). Plaintiff stated that he has not attended a VFW meeting in two years. (Id.). Plaintiff testified that he does not belong to a church or any organizations. (Id.). Plaintiff stated that he visits his friend who lives down the street almost every day. (Id.). Plaintiff testified that he has another friend who lives down the street. (Id.). Plaintiff stated that he also drives his scooter to visit this friend. (Id.). Plaintiff testified that he does not have any problems getting along with neighbors or friends. (Id.). Plaintiff stated that he occasionally shops. (Id.). Plaintiff testified that the trip from his home to the store and back is 2.4 miles. (Tr. 251). Plaintiff stated that his wife shops when he does not. (Id.).

Plaintiff testified that he can stand in one place for five to ten minutes without his cane. (Id.). Plaintiff stated that he can stand for a half hour or longer with his cane. (Id.). Plaintiff testified that standing is easier for him than walking. (Id.). Plaintiff stated that he can walk about

a half mile with his cane.  (<u>Id.</u>).  Plaintiff testified that he could walk this distance only one time in a day because his legs and arms would hurt.  (Tr. 652).  Plaintiff stated that he could sit for eight to ten hours a day if he were not looking at a computer.  (<u>Id.</u>).  Plaintiff testified that he can lift fifteen pounds.  (<u>Id.</u>).  Plaintiff stated that he cannot bend and picks things up from the ground. (<u>Id.</u>).  Plaintiff testified that if he drops something on the ground, his wife picks it up for him. (<u>Id.</u>).  Plaintiff stated that his dog also picks up items and hands them to him.  (<u>Id.</u>).  Plaintiff testified that he does not have any difficulty reaching over his head or reaching out to the side with his arms.  (Tr. 653).  Plaintiff stated that his physical restrictions have improved somewhat over the years.  (<u>Id.</u>).

Plaintiff testified that he smokes about a half package of cigarettes a day.  (<u>Id.</u>).  Plaintiff stated that when he lights a cigarette he places it in the ash tray and works on the computer.  (<u>Id.</u>). Plaintiff testified that his cigarettes usually burn out while he is working.  (<u>Id.</u>).  Plaintiff stated that he does not believe that he receives all of the adverse health benefits from smoking an entire cigarette, although he does breathe in the smoke.  (<u>Id.</u>).

The ALJ then examined plaintiff, who testified that he receives counseling and medication refills from his doctor for his mental impairment.  (Tr. 654).  Plaintiff stated that he sees his doctor every three months for counseling.  (<u>Id.</u>).

Plaintiff testified that he used marijuana heavily while he was in Vietnam.  (Tr. 655). Plaintiff stated that he was not using marijuana at the time of the hearing.  (<u>Id.</u>).  The ALJ stated that plaintiff's medical records from Dr. Santos in 2001 indicate that plaintiff was using marijuana. (<u>Id.</u>).  Plaintiff testified that Dr. Santos probably asked him if he smoked marijuana.  (<u>Id.</u>). Plaintiff stated that he attended drug rehabilitation one time in 1971.  (<u>Id.</u>).  Plaintiff testified that

he also attended Alcoholics Anonymous meetings. (Id.). Plaintiff stated that he has not been in prison or jail. (Tr. 656). Plaintiff testified that he was arrested in the 1970s for drinking and driving. (Id.).

The ALJ next examined the vocational expert, Michael Brethauer, who testified that he had reviewed the exhibits from plaintiff's file and that he was not personally acquainted with plaintiff. (Tr. 657). The ALJ stated that the record and plaintiff's testimony show that plaintiff has work experience as a carpenter, hospice care giver, and a janitor at a bowling alley. (Tr. 658). Mr. Brethauer testified that he found the following three additional occupations in the record: bartender, stock clerk, and cleaner for a home restoration service. (Id.). Mr. Brethauer stated that plaintiff also worked as not only a self-employed carpenter, but also a contractor. (Id.).

The ALJ then examined plaintiff, who testified that he recalled the occupations cited by the ALJ. (Id.). Plaintiff stated that he worked as a bartender in 1982. (Id.). Plaintiff testified that he did not recall working as a stock clerk. (Tr. 659). Mr. Brethauer stated that the stock clerk position was part of the bartender job. (Id.). Mr. Brethauer testified that plaintiff indicated in the job description that he inventoried the stock, which is a separate occupation of stock clerk. (Id.). Plaintiff testified that he worked as a cleaner for a company that shampooed carpets. (Id.). Plaintiff stated that he did not recall when he performed this job. (Id.).

The ALJ then examined Mr. Brethauer, who testified that the stock clerk position is classified as heavy and semi-skilled, with transferable skills involving inventory and record-keeping. (Tr. 660). Mr. Brethauer stated that the bartender position is classified as light in the Dictionary of Occupational Titles (DOT), medium as described by plaintiff, and semi-skilled, with transferable skills involving serving, sales, and making change. (Id.). Mr. Brethauer testified that

the cleaner position is classified as heavy and unskilled in the DOT and light as described by plaintiff, with no transferable skills. (Id.). Mr. Brethauer stated that the cleaner, home restoration service position is heavy and semi-skilled, with transferable skills involving measuring, cleaning solutions, chemicals, and operating cleaning machines. (Id.). Mr. Brethauer testified that the personal attendant position is light and semi-skilled, with transferable skills involving serving and dealing with people. (Id.). Mr. Brethauer stated that the carpenter position is skilled and is classified as medium in the DOT and heavy as described by plaintiff, with transferable skills involving utilizing hand tools and machinery, measuring, marking, cutting and assembling, fabricating, studying blueprints, and sketches of building plans. (Tr. 661). Mr. Brethauer testified that the contractor position is skilled and classified as light in the DOT and medium to heavy as described by plaintiff, with transferable skills involving measuring, ordering, inventory, supervising, customer service, and estimating. (Id.).

The ALJ asked Mr. Brethauer to assume a hypothetical individual who was functionally limited to light work, work involving one or two-step instructions, and requires a cane to ambulate. (Id.). Mr. Brethauer testified that such an individual would not be able to perform any of plaintiff's past work. (Id.). Mr. Brethauer stated that the individual would be able to perform other jobs, including cashier checker, which is a light job with transferable skills involving customer service and making change; cashier check cashing agency; cashier, box office; cashier, courtesy booth; cashier I; and 15 to 18 other cashier positions. (Tr. 662). Mr. Brethauer testified that there are approximately 70,000 such jobs in Missouri and 3.5 million nationally. (Id.). Mr. Brethauer stated that such an individual could also work as an inspector and hand packer. (Id.). Mr. Brethauer testified that there are 12,000 of these positions in Missouri and 600,000

nationally.  (Tr. 663).

The ALJ next told Mr. Brethauer to assume an individual who was limited to sedentary exertional work, involving one or two step instructions, and also requiring the use of a cane. (Id.).  Mr. Brethauer testified that such an individual could not perform any jobs.  (Id.).

Plaintiff's attorney then examined Mr. Brethauer, who testified that a cashier checker is a semi-skilled occupation.  (Tr. 664).  Mr. Brethauer stated that a cashier checker is required to make change, add, and subtract.  (Tr. 665).  Mr. Brethauer testified that, technically, skills can only be transferable from skilled work to other skilled work, although functions involved in semi-skilled work such as making change and serving people would help the individual to perform unskilled work.  (Id.).  Mr. Brethauer stated that unskilled jobs such as cashier do not require transferrable skills.  (Tr. 666).

Plaintiff's attorney told Mr. Brethauer to assume an individual who has a marked limitation in the ability to cope with stress, a marked limitation in functioning independently, problems dealing with changes in a routine work setting, a substantial loss of the ability to respond to supervisors and co-workers, problems with remembering simple instructions, and poor concentration.  (Tr. 667).  Mr. Brethauer testified that such an individual would not be able to perform any of plaintiff's past work or any other jobs in the national economy.  (Id.).  Plaintiff's attorney stated that these limitations were found by Dr. J.C. Corvalan.  (Tr. 668).

The ALJ then examined Mr. Brethauer, who testified that Cashier II is an unskilled occupation whereas Cashier I is a semi-skilled occupation.  (Id.).  Mr. Brethauer stated that Cashier I should not have been included in his list of jobs.  (Tr. 669).  Mr. Brethauer testified that there are 30,000 unskilled Cashier II jobs in Missouri and 1.5 million nationally.  (Id.).  Mr.

Brethauer stated that the original number he provided included both Cashier I and Cashier II jobs. (Id.).

**B.** **Relevant Medical Records**

In a letter to the state agency dated March 2, 2000, Gerald Mahon, M.D. stated that plaintiff's major medical problem is gastroesophageal reflux disease (GERD)[3] with esophageal spasm. (Tr. 235). Dr. Mahon stated that plaintiff has severe esophageal spasm requiring him to take Prevacid and Imipramine daily. (Id.). Dr. Mahon indicated that the Imipramine is the only medication that controls plaintiff's pain, yet it causes significant sedation which makes plaintiff unable to function at a job. (Id.).

Plaintiff presented to James Schutzenhofer, M.D. for a consultative examination at the request of the Commissioner on March 30, 2000. (Tr. 221-24). Plaintiff's chief complaints were listed as arthritis, back problems; and chest pains, sinus problems. (Tr. 221). Plaintiff reported low back pain with some radiation up into the neck regions and occasional weakness and numbness of the right arm. (Id.). Plaintiff stated that he could not bend or squat well, could not sit for longer than fifteen minutes, could not stand longer than thirty minutes, could walk one block or so with his cane, could walk about a half block without the cane, and could lift five pounds. (Id.). Plaintiff reported chest pain that occurs on a daily basis, which is not exacerbated by exertion and only lasts a few seconds in duration. (Id.). Plaintiff's medications were listed as Calcium, Prilosec, and Amitriptyline. (Tr. 222). Upon physical examination, plaintiff had a regular heart rate and rhythm, with no murmurs, gallops, or rubs. (Tr. 223). Plaintiff could not

---

[3]A syndrome due to structural or functional incompetence of the lower esophageal sphincter, which permits retrograde flow of acidic gastric juice into the esophagus. Stedman's at 556.

heel walk or toe walk too well, but he could squat half way. (Id.). Plaintiff could lumbar flex to 60 degrees without tenderness or spasm but he almost fell forward. (Id.). Plaintiff's strength was 4 out of 5 in the lower extremities, and he had full strength in the upper extremities. (Id.). Plaintiff's gait was slightly wide based and somewhat unsteady and he had a left sided limp. (Id.). Plaintiff had no difficulty getting on and off of the examination table and no muscle atrophy. (Id.). Plaintiff had some decreased range of motion of the hips but this was due to pain in the thighs and there was no actual tenderness. (Id.). Plaintiff had no actual hip joint pain with movement and full range of motion of the knees and all other joints without swelling. (Id.). Dr. Schutzenhofer's impression was: arthritis and bursitis;[4] and chest pains, which apparently is related to GERD and has improved on Prilosec. (Tr. 224). Dr. Schutzenhofer noted that plaintiff's chest pains are atypical, non anginal, and he had a normal stress test and a normal cardiac exam. (Id.).

Plaintiff saw Eugene R. Adelmann, M.D. on May 19, 2000. (Tr. 211-13). Plaintiff complained of hand cramps, poor balance, and back pain. (Tr. 211). Plaintiff reported that he quit working as a self-employed carpenter seven years prior to his examination because his hands were cramping up and he had difficulty gripping. (Id.). Upon physical examination, plaintiff was unable to stand on either leg unassisted and his walking was somewhat stiff legged and lurching. (Tr. 213). Plaintiff's tandem walking was very poor. (Id.). Plaintiff's lateral rotation of the neck was limited to 70 degrees, extension was limited to 30 degrees, and flexion was limited to 40

---

[4]Inflammation of a bursa. Stedman's at 282.

degrees.  (Id.).  Dr. Adelmann's impression was ataxia,[5] possible spastic diplegia[6] and possible cervical[7] myelopathy.[8]  (Id.).  Dr. Adelmann recommended that plaintiff undergo further testing.  (Id.).

On June 6, 2000, plaintiff underwent an MRI of the cervical spine, which revealed spondylosis[9] at C5-6[10] and C6-7, and degenerative disc disease[11] at C5-6 and C6-7.  (Tr. 207).

On June 17, 2000, plaintiff underwent an MRI of the brain, which was negative.  (Tr. 206).

Ofelia Gallardo, M.D., a state agency consulting physician completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment on June 23, 2000.  (Tr. 115-25, 126-29).  Dr. Gallardo indicated that plaintiff's anxiety disorder and substance abuse disorder were severe and required a residual functional capacity determination.  (Tr. 115).  Dr. Gallardo

---

[5]An inability to coordinate muscle activity during voluntary movement.  Stedman's at 172.

[6]A type of cerebral palsy in which there is bilateral spasticity, with the lower limbs more severely affected.  Stedman's at 546.

[7]The back is comprised of the cervical, thoracic and lumbar regions.  In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra.  The coccyx, or tail bone, lies below the sacrum.  See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

[8]Disorder of the spinal cord.  Stedman's at 1270.

[9]Stiffening of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature.  Stedman's at 1813.

[10]Abbreviation for cervical vertebra (C1-C7).  Stedman's at 285.

[11]A general term for both acute and chronic processes destroying the normal structure and function of the intervertebral discs.  Medical Information Systems for Lawyers, § 6:201.

- 15 -

expressed the opinion that plaintiff's mental impairments caused moderate limitations in the ability to carry out detailed instructions and the ability to set realistic goals or make plans independently of others. (Tr. 126-27).

Plaintiff presented to the VA Hospital on July 11, 2000, with complaints of walking difficulty for six months. (Tr. 189). Plaintiff reported pain in the neck, arms, and legs. (Id.). Plaintiff also reported neck tilt to the left side and bad memory. (Id.). The impression of Dr. Steven R. Brenner was progressive weakness of the arms and legs and unsteadiness. (Id.). Dr. Brenner noted that plaintiff has a very unsteady gait and needs to walk with a cane. (Id.). Dr. Brenner stated that he did not believe that plaintiff was capable of any kind of employment at that time. (Id.). Dr. Brenner recommended that plaintiff undergo testing. (Id.).

Plaintiff saw Dr. Adelmann on July 21, 2000 for a re-evaluation. (Tr. 201-02). Dr. Adelmann noted that the MRI of the cervical spine showed some spondylitic changes but not specifically cord compression, and some mild degenerative changes. (Tr. 201). Upon physical examination, plaintiff winced in pain but had fair neck mobility. (Id.). Plaintiff's gait was more typical for astasia abasia,[12] with flinging of his arms though he maintained a narrow based gait quite well. (Tr. 202). Plaintiff was able to stand on either leg unassisted. (Id.). Dr. Adelmann's impression was low back pain and mild degenerative arthritis. (Id.). Dr. Adelmann stated that he was not convinced that plaintiff has ataxia or spasticity. (Id.). He noted that many of plaintiff's complaints are subjective and out of proportion to clinical findings. (Id.). Dr. Adelmann stated that plaintiff's back pain requires symptomatic treatment only. (Id.).

---

[12]Inability to either stand or walk in a normal manner; the gait is bizarre and is not suggestive of a specific organic lesion; often the patient sways wildly and nearly falls, but recovers at the last moment. Stedman's at 169.

Plaintiff underwent MRIs of the thoracic and lumbar spine on September 13, 2000, which were normal. (Tr. 183-84).

Plaintiff presented to the VA Hospital on September 14, 2000, with complaints of difficulty walking. (Tr. 181). Plaintiff was unable to heel, toe, or tandem walk. (Id.). The impression of Dr. Steven Park was cerebellar atrophy,[13] poor nutrition and inconsistency in ataxia. (Id.). Dr. Park advised plaintiff to quit drinking and follow-up in three to four weeks. (Id.).

Plaintiff presented to the VA Hospital on October 13, 2000, at which time degenerative changes at the C6-C7 level were noted. (Tr. 175). Central disc bulges were also noted at the T7-T8,[14] and T8-T9 levels. (Tr. 176). The assessment of Dr. Brenner was gait unsteadiness, or ataxia which appears to be prominent. (Tr. 175). Dr. Brenner also noted that plaintiff drank around six beers per day and was advised to quit drinking. (Id.).

Plaintiff saw psychiatrist J.C. Corvalan at the VA Hospital on September 18, 2000. (Tr. 180). Dr. Corvalan noted that plaintiff was irritable, depressed, and experienced nightmares and intrusive thoughts. (Id.). Dr. Corvalan diagnosed plaintiff with alcoholism (by history) and PTSD. (Id.). Dr. Corvalan prescribed Buspar, Sertraline, and Klonopin, and instructed plaintiff to quit drinking. (Id.).

Plaintiff saw Dr. Corvalan on November 20, 2000, at which time Dr. Corvalan stated that plaintiff was tolerating his medications well but was still drinking. (Tr. 173). Dr. Corvalan noted that plaintiff smelled of alcohol. (Id.). Plaintiff reported nightmares, intrusive thoughts, poor

---

[13]A degeneration of a portion of the brain as the result of a genetic trait or exposure to toxic agents, as in alcoholism. Stedman's at 178.

[14]Abbreviation for thoracic vertebra (T1-T12). Stedman's at 1930.

concentration, and flashbacks. (Id.). Dr. Corvalan found that plaintiff had a marked limitation in his ability to cope with stress, ability to function independently, problems functioning socially, problems responding to criticism, problems remembering even simple instructions, poor concentration, a substantial loss of ability to respond to supervision and co-workers, and a substantial loss of ability to deal with changes in a routine setting. (Id.). Dr. Corvalan diagnosed plaintiff with alcoholism (by history) and chronic PTSD. (Id.). He assessed a GAF[15] of 40.[16] (Id.).

On March 19, 2001, plaintiff was prescribed a wheelchair. (Tr. 404).

Plaintiff saw Dr. Corvalan on April 30, 2001, at which time he reported that he was not drinking and felt better. (Tr. 405). Plaintiff stated that he was still experiencing flashbacks. (Id.). Plaintiff indicated that Valium helps to relax him. (Id.). Dr. Corvalan increased plaintiff's Clonazepam and instructed plaintiff not to take Valium. (Id.). Dr. Corvalan diagnosed plaintiff with PTSD, chronic. (Id.).

Plaintiff saw Dr. Corvalan on May 14, 2001, at which time he reported that he was sleeping better with his medications. (Tr. 409). Plaintiff stated that he was still having intrusive thoughts, but no nightmares or flashbacks. (Id.). Plaintiff reported being tired and having poor

---

[15]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders 32 (4th Ed. 1994) ("DSM IV").

[16]A GAF score of 40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work). DSM-IV at 32.

energy.  (Id.).

On June 6, 2001, plaintiff requested an electric wheelchair because he was having increased difficulty wheeling himself with his manual one.  (Tr. 409).  Plaintiff was issued a motorized scooter.  (Tr. 414).

Plaintiff presented to the emergency room at the VA Hospital on October 10, 2001, with complaints of chronic back pain, pain in both legs, and right upper extremity weakness.  (Tr. 421-22).  Plaintiff was diagnosed with chronic back pain.  (Tr. 422).  Plaintiff was given Toradol and was discharged.  (Id.).

On October 30, 2001, plaintiff had an unsteady gait but denied drinking for several months.  (Tr. 430).  Plaintiff complained of increased weakness in the upper extremities.  (Id.).  Dr. Hudda Hantush's impression was either spinocerebellar ataxia[17] related to alcohol or HIV.  (Id.).

Plaintiff underwent nerve conduction studies of both arms and hands and an electromyogram(EMG)[18] of the left arm and cervical paraspinals on January 3, 2002.  (Tr. 435).  The cervical paraspinals revealed evidence of a possible C5-6 radiculopathy,[19] yet plaintiff's inability to relax compromised the exam.  (Id.).

Plaintiff saw Dr. Corvalan on February 4, 2002, at which time Dr. Corvalan noted that plaintiff was tolerating his medication well, and had no side effects.  (Tr. 438).  Plaintiff reported

---

[17]A generic term used to describe autosomal dominant-inherited ataxia that has a progressive course.  See Stedman's at 173.

[18]A graphic representation of the electric currents associated with muscular action.  Stedman's at 622.

[19]Disorder of the spinal nerve roots.  Stedman's at 1622.

occasional nightmares and flashbacks. (Id.). Plaintiff's concentration and short-term memory were described as poor. (Id.). Plaintiff denied drinking but admitted to smoking marijuana once a day. (Id.). Dr. Corvalan's assessment was: PTSD, chronic; hyperlipedemia;[20] and spinal cord disease. (Id.).

Plaintiff was admitted to the VA Hospital for alcoholism/detoxification from April 29, 2002, through May 6, 2002. (Tr. 481). Plaintiff was brought to the hospital by his cousin and was intoxicated and cursing the staff. (Id.). Plaintiff's blood alcohol level was .231. (Id.). Plaintiff claimed that he had consumed only two beers, and that he drank no more than twelve beers per week. (Tr. 482). Plaintiff reported that his nightmares were under control, although he is easily startled with noise. (Tr. 385). Plaintiff stated that he spends his day on the computer, surfing pornography and gambling sites. (Id.). Plaintiff was evaluated in the neurology clinic for his unsteady gait. (Tr. 402). An MRI revealed degenerative changes at the C5-C7 levels, with no other neurological disease. (Id.). It was noted that plaintiff's unsteady gait could be related to alcohol dependence. (Id.). Plaintiff opted to stop neurology follow-up. (Id.). Dr. Mohinder Partap diagnosed plaintiff with alcohol dependence and PTSD, and assigned a GAF score of 40 upon admission. (Tr. 457).

Plaintiff presented for a psychiatric follow-up with Dr. Corvalan on May 29, 2001. (Tr. 486). Plaintiff reported that he was not drinking and was taking his medication. (Id.). Plaintiff stated that he was having flashbacks every day and was unable to concentrate or function. (Id.). Dr. Corvalan stated that plaintiff was unable to function in any normal competitive environment, unable to concentrate, had difficulties following instructions, was irritable, isolated, and tired due

---

[20]Elevated levels of lipids in the blood plasma. Stedman's at 922.

to insomnia.  (Id.).  Dr. Corvalan's assessment was PTSD and alcohol dependence.  (Id.).

Plaintiff saw Dr. Corvalan on September 18, 2002, at which time plaintiff reported that he was not drinking.  (Tr. 492).  Plaintiff stated that he did not need to drink because he was taking his medications.  (Id.).  Plaintiff reported that he was still having nightmares, was not sleeping well, was irritable, had intrusive thoughts, and flashbacks.  (Id.).  Plaintiff also reported problems with concentration, poor memory, and difficulty relating to people.  (Id.).  Dr. Corvalan's assessment was PTSD and alcoholism.  (Id.).

Plaintiff presented to the VA Wheelchair Specialty Clinic on October 15, 2002, for an evaluation of his wheelchair.  (Tr. 495).  Plaintiff indicated that his scooter was too big for him.  (Id.).  Plaintiff ambulated with an unsteady gait while using his cane.  (Tr. 496).  Plaintiff's gait improved with use of a walker.  (Id.).  Plaintiff was instructed to use his walker instead of his cane.  (Id.).  Plaintiff indicated that he did not want to use his walker.  (Id.).  Plaintiff's request for a electric wheelchair was denied.  (Id.).

Plaintiff saw Dr. Hantush on January 24, 2003, at which time it was noted that plaintiff was angry with a flat affect.  (Tr. 498).  Plaintiff complained of auditory hallucinations.  (Id.).  Plaintiff indicated that he had run out of medication two months prior to his appointment.  (Id.).  Dr. Hantush refilled plaintiff's medications.  (Id.).

Plaintiff saw Dr. Corvalan on May 19, 2003.  (Tr. 500-03).  Plaintiff reported nightmares that were more frequent and intense, and Vietnam flashbacks.  (Tr. 502).  Dr. Corvalan stated that plaintiff remained unable to function, was unable to concentrate, unable to follow instructions, isolates, and unable to be around people.  (Tr. 503).  Dr. Corvalan found that plaintiff was depressed, had no energy, and was moody.  (Id.).  Dr. Corvalan expressed the opinion that

plaintiff was unable to sustain gainful employment.  (Id.).

Plaintiff presented to the emergency room at the VA Hospital on October 5, 2003, with complaints of shortness of breath and left sided chest pain and palpitations.  (Tr. 504-05). Plaintiff was given Nitroglycerin, which resolved his pain and decreased his pulse rate.  (Tr. 505). Plaintiff underwent chest x-rays on October 6, 2003, which revealed no evidence of congestive changes and a normal heart size.  (Tr. 383).  An echocardiogram revealed no abnormalities.  (Tr. 522).  A chemical stress test performed on October 7, 2003, revealed a moderate sized defect of the inferior wall with questionable mild ischemia,[21] and normal left ventricular wall motion and wall thickening.  (Tr. 377).

Plaintiff was hospitalized from October 8, 2003, through October 13, 2003, for unstable angina.[22]  (Tr. 389-92).  Plaintiff was given Nitroglycerin, which completely relieved his chest pain.  (Id.). Plaintiff was diagnosed with unstable angina, hyperlipidemia, alcoholism, and PTSD. (Tr. 395).

Plaintiff saw Dr. Mohammad Qadir at the VA Hospital on March 3, 2004, for follow-up and medication refill.  (Tr. 371-74).  Plaintiff denied shortness of breath or chest pain.  (Tr. 371). Dr. Qadir's impression was: peripheral neuropathy[23]/abnormality of gait, confined to motor-assisted chair and use of cane; possible coronary artery disease, hypertrophy of prostate, hyperlipidemia, alcoholism, and anxiety.  (Tr. 373-74).

--------

[21]Local loss of blood supply due to mechanical obstruction of the blood vessel.  Stedman's at 1001.

[22]A severe, often constricting pain or sensation of pressure.  Stedman's at 85.

[23]A disease affecting the peripheral nerves.  Medical Information Systems for Lawyers, § 6:201.

Plaintiff saw Dr. Corvalan on June 21, 2004, at which time Dr. Corvalan diagnosed plaintiff with PTSD and drug dependency, and assessed a GAF score of 40.  (Tr. 368).

Plaintiff was prescribed a new motorized scooter by the VA on August 10, 2004.  (Tr. 367).

Plaintiff saw Dr. Qadir on December 2, 2004, for medication refills.  (Tr. 360-63). Plaintiff denied shortness of breath and chest pain and walked with a cane rather than his scooter. (Tr. 361).  Dr.  Qadir diagnosed plaintiff with peripheral neuropathy/abnormality of gate (confine to motor assisted chair and use cane); possible coronary artery disease; hypertrophy of prostate; hyperlipidemia; alcoholism; and anxiety.  (Tr. 363).

Plaintiff underwent a left cardiac catheterization and ventriculopgram on February 2, 2005, which revealed minimal coronary artery disease in one vessel, a normal left ventricular ejection fraction of 55%, and left ventricular hypertrophy.  (Tr. 353-55).

### The ALJ's Determination

The ALJ made the following findings:

1.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2.  The claimant has a medically determinable "severe" impairment at the second step of the sequential evaluation process.

3.  The claimant's medically determinable impairments, whether considered individually or in combination, do not meet or medically equal any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4.  I find the claimant's allegations regarding his limitations are not credible for the reasons set forth in the body of the decision.

5.  I have carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments.

6.      It is found that as a result of the claimant's combined impairments that he cannot engage in heavy work or complicated work, but that he retains the ability to perform light work with an SVP of 3 or less. He can lift and carry up to 20 pounds occasionally and 10 pounds frequently, stand and walk for at least six hours a work day and sit throughout a work day. He can push or pull on arm or leg controls.

7.      The claimant can perform his past relevant work as a janitor.

8.      Since his alleged onset date the claimant has been a younger individual age 45-49 and closely approaching advanced age (50-54).

9.      The claimant has a Graduate Equivalency Diploma (GED).

10.     The claimant has the residual functional capacity to perform a significant range of light work.

11.     Using Medical-Vocational Rules 202.21 and 202.14 as a tool for decision-making in conjunction with credible vocational expert testimony, I find that there are a significant number of jobs in the national economy and regional economy that he can perform. Examples of those jobs are cashier/checker, cashier II and inspector/packer. There are over 4.5 million of those jobs in the national economy and 82,000 of them in the claimant's regional economy.

12.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision (20 CFR 416.920 (f and g)).

(Tr. 267).

The ALJ's final decision reads as follows:

Based on the application protectively filed on August 25, 1999, I find that the claimant is not eligible for Supplemental Security Income payments under Sections 1602 and 1614(a)(3)(A) of the Social Security Act.

(Tr. 268).

<u>**Discussion**</u>

**A.      <u>Standard of Review</u>**

        Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency.  <u>See</u> <u>Ostronski v. Chater</u>, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it.  <u>See</u> <u>Roberts v. Apfel</u>,

222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a conclusion.  <u>See</u> <u>Kelley v.</u>

<u>Callahan</u>, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the Commissioner's

findings, the denial of benefits must be upheld.  <u>See</u> <u>Robinson v. Sullivan</u>, 956 F.2d 836, 838 (8th

Cir. 1992).  The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  <u>See</u> <u>Johnson v. Chater</u>, 87 F.3d 1015,

1017 (8th Cir. 1996) (citing <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court

must also take into consideration the weight of the evidence in the record and apply a balancing

test to evidence which is contrary."  <u>Burress v. Apfel</u>, 141 F.3d 875, 878 (8th Cir. 1998).  The

analysis required has been described as a "searching inquiry."  <u>Id.</u>

**B.      <u>The Determination of Disability</u>**

        The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of

not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant

has the burden of proving that s/he has a disabling impairment.  <u>See</u> <u>Ingram v. Chater</u>, 107 F.3d

598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the

claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent."

20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

C.    **Plaintiff's Claims**

Plaintiff argues that the ALJ erred in determining plaintiff's residual functional capacity. Plaintiff contends that the ALJ disregarded evidence favorable to him in assessing his credibility and residual capacity. As such, plaintiff also challenges the ALJ's credibility analysis. The undersigned will discuss plaintiff's claims in turn, beginning with the ALJ's credibility analysis.

1.    **Credibility Analysis**

Plaintiff contends that the ALJ improperly assessed his credibility. Defendant argues that the ALJ properly applied the Polaski factors and found plaintiff's subjective complaints to be not credible.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322. See Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. The primary question is not whether plaintiff suffers from the impairments alleged; it is whether plaintiff is fully credible when he claims that the symptoms prevent him from engaging in his prior work. See Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of limitations to a degree of severity to prevent him from working are credible.

In his opinion, the ALJ specifically cited the relevant Polaski factors. (Tr. 262). The ALJ

then pointed out <u>Polaski</u> factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling impairments. The ALJ first discussed plaintiff's work record. (Tr. 262). The ALJ stated that plaintiff has a very poor work record. (<u>Id.</u>). The ALJ noted that since 1982, plaintiff has earned over $200 a year just five times and since then he has never earned more than $4,064 a year. (<u>Id.</u>). The ALJ pointed out that Social Security benefits would provide plaintiff with more annual income that he earned in any of the past 23 years. (<u>Id.</u>). Although not controlling on the issue of plaintiff's complaints of disabling pain, a claimant's work history is a proper factor in assessing credibility. <u>See</u> <u>Brown v. Chater</u>, 87 F.3d 963, 965 (8th Cir. 1996). A poor work history prior to the alleged onset of disability lessens the credibility of a plaintiff's allegations of disabling pain. <u>See</u> <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1214 (8th Cir. 1993).

The ALJ next discussed inconsistencies in plaintiff's statements. (Tr. 263). The ALJ noted that with regard to his computer use, plaintiff testified that he spends his time looking up friends and playing games, yet the evidence shows that he spends his day surfing pornography and gambling cites. (Tr. 263, 646, 385). The ALJ next noted that although plaintiff testified that he had not used drugs since Viet Nam and he was not drinking, the evidence shows otherwise. (Tr. 263). Plaintiff's medical records are replete with references to alcohol use and drug dependency. (Tr. 181, 175, 173, 438, 481, 402, 486, 368). The ALJ pointed out that when plaintiff was admitted for detoxification in April of 2002, he claimed that he had only consumed two beers, yet he had a blood alcohol level of .231. (Tr. 263, 481-82). The ALJ concluded that, due to plaintiff's documented veracity problems at the hearing and in the medical community, his subjective allegations cannot be believed.

The ALJ next discussed the medical evidence. (Tr. 263-64). The ALJ found that the

medical evidence does not support plaintiff's allegations of disability. (Id.). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003). With regard to plaintiff's gait and walking impairment, the ALJ noted that Dr. Adelmann, who is a Board Certified Neurologist, examined plaintiff more than once and concluded as follows after conducting objective testing: "I am not convinced that he has ataxia or spasticity. Many of his complaints are subjective and out of proportion to clinical findings." (Tr. 202). The ALJ stated that Dr. Adelmann's assessment is consistent with the evidence as a whole. (Id.). Specifically, the ALJ noted that there is no evidence of herniation or stenosis of the lumbar spine, no EMG evidence of lower extremity problems, no atrophy of the lower extremities, good strength in the lower extremities, and a normal brain scan. (Tr. 264, 223, 206, 201, 402). The ALJ stated that plaintiff has minimal degenerative disease of the lumbar spine and spondylosis at C5-6 and C6-7, with no motor, sensory, or reflex abnormalities. (Id.). The ALJ concluded that plaintiff does not have a medically determinable impairment that would account for his alleged walking and standing problem. (Tr. 264).

With respect to plaintiff's mental impairments, the ALJ noted that plaintiff's PTSD does not prevent him from engaging in a wide range of activities of daily living. Plaintiff testified that he uses a computer for ten to twelve hours a day, cares for two dogs and two cats, reads magazines, watches television, cooks, washes dishes, does laundry, visits with friends, and occasionally drives. (Tr. 646-48). Significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001). As such, the ALJ

properly determined that plaintiff's ability to engage in all of these activities on a regular basis appears inconsistent with the inability to work.

The ALJ next discussed plaintiff's medications. The ALJ noted that plaintiff testified that when he takes his medication, he is "fine." (Tr. 264, 644). Evidence of effective medication resulting in relief may diminish the credibility of a claimant's complaints. See Rose v. Apfel, 181 F.3d 943, 944 (8th Cir. 1999). Plaintiff also testified that he does not experience any side effects from the medication he takes for his PTSD. The absence of side effects from medication is a proper factor to be considered in evaluating subjective complaints of pain. See McKinney v. Apfel, 228 F.3d 860, 864 (8th Cir. 2000).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). Each and every Polaski factor, however, need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of a disabling impairment are sufficient and his finding that plaintiff's complaints are not entirely credible is supported by substantial evidence.

## 2.      Residual Functional Capacity

Plaintiff argues that the ALJ erred in assessing his residual functional capacity. Specifically, plaintiff contends that the ALJ erred in evaluating the medical opinion evidence. Defendant argues that the ALJ's residual functional capacity determination is supported by substantial evidence in the record.

After properly determining that plaintiff's subjective complaints were not fully credible,

the ALJ formulated the following residual functional capacity:

> It is found that as a result of the claimant's combined impairments that he cannot engage in heavy work or complicated work, but that he retains the ability to perform light work with an SVP of 3 or less. He can lift and carry up to 20 pounds occasionally and 10 pounds frequently, stand and walk for at least six hours a work day and sit throughout a work day. He can push or pull on arm or leg controls.

(Tr. 285).

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). This is to be contrasted with the axiom that "the opinion of a consulting physician who examines claimant once or not at all does not generally constitute substantial evidence." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (quoting Kelley, 133 F.3d at 589). Opinions of treating physicians may be discounted or disregarded where other medical "assessments are supported by better or more thorough medical evidence." Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997). An ALJ is free to reject the conclusions of any medical source if those findings are inconsistent with the record as a whole. See Johnson, 240 F.3d at 1148.

Plaintiff argues that the ALJ erred in assigning significant weight to the opinion of Dr. Adelmann. Dr. Adelmann examined plaintiff on two occasions and ordered a number of objective tests. (Tr. 211-13). Dr. Adelmann noted that plaintiff's MRI scans were normal other than some mild degenerative changes. (Tr. 201). Dr. Adelmann stated that upon physical examination, plaintiff was flinging his arms "to and fro," yet he maintained a "narrow based gait quite well."

(Tr. 202).  He noted that plaintiff was able to stand on either leg unassisted.  (Id.).  Dr. Adelmann

concluded that there was little medical basis for plaintiff's subjective complaints.  (Id.).  The ALJ

was entitled to accord significant weight to Dr. Adelmann's opinion as it was supported by his

own treatment notes and by objective testing.  Further, Dr. Adelmann had seen plaintiff on two

occasions.

Plaintiff also argues that the ALJ erred in ignoring the opinion of plaintiff's treating

psychiatrist, Dr. Corvalan.  Dr. Corvalan expressed the opinion that plaintiff's PTSD was

disabling.  (Tr. 173, 486, 500-03).  The ALJ acknowledged Dr. Corvalan's opinion but indicated

that he was discounting it.  The ALJ pointed out that on one of the occasions Dr. Corvalan

expressed the opinion that plaintiff's PTSD was disabling, Dr. Corvalan noted that plaintiff was

drinking and smelled of alcohol at the time.  (Tr. 173).  On another occasion, Dr. Corvalan found

that plaintiff's concentration and short-term memory were poor, and that plaintiff was having

nightmares and flashbacks, yet Dr. Corvalan also noted that plaintiff was smoking marijuana daily.

(Tr. 438).  The ALJ therefore determined that Dr. Corvalan was assessing limitations related to

intoxication.  (Tr. 266).  The ALJ also noted that Dr. Corvalan's opinion appeared to be based on

plaintiff's subjective allegations rather than clinical observations.  (Id.).  Further, Dr. Corvalan's

opinion is inconsistent with plaintiff's own testimony, as previously discussed.  Thus, the ALJ

properly discounted Dr. Corvalan's opinion.

The undersigned finds that the ALJ's residual functional capacity determination is

supported by substantial evidence.  Determination of residual functional capacity is a medical

question and at least "some medical evidence 'must support the determination of the claimant's

[residual functional capacity] and the ALJ should obtain medical evidence that addresses the

claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

In this case, the residual functional capacity formulated by the ALJ is supported by the evidence as a whole. As discussed above, the medical record does not support the presence of a disabling physical impairment. Rather, objective testing revealed that plaintiff suffers from minimal degenerative disease of the lumbar spine and spondylosis at C5-6 and C6-7. Plaintiff testified that he is able to sit for ten to twelve hours a day while working on the computer. (Tr. 646). Plaintiff stated that he could sit for eight to ten hours a day if he were not looking at a computer. (Tr. 652). With regard to plaintiff's mental impairments, the state agency physician expressed the opinion that plaintiff only had moderate limitations in the ability to carry out detailed instructions and the ability to set realistic goals or make plans independently of others. (Tr. 126-27). These limitations were taken into account by the ALJ when he limited plaintiff to simple unskilled work. Further, plaintiff testified that he was "fine" when he took his medication. (Tr. 644). Thus, the ALJ's residual functional capacity determination is supported by substantial evidence in the record.

## **Conclusion**

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

Dated this ___24th___ day of September, 2007.

_Lewis M. Blanton_

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE